914

## In re ST. LOUIS SOUTHWESTERN RY. CO.
### No. 8497.

District Court, E. D. Missouri, E. D.

Feb. 9, 1944.

John R. Turney, of Washington, D. C., and Lashly, Lashly, Miller & Clifford, of St. Louis, Mo., for St. Louis Southwestern R. Co., debtor.

A. H. Kiskaddon, General Counsel, and John W. Murphy, Asst. General Solicitor, of St. Louis, Mo., for Berryman Henwood, trustee.

Bryan, Williams, Cave & McPheeters, of St. Louis, Mo., for St. Louis Union Trust Co.

Rathbone, Perry, Kelly & Drye, of New York City, and Anderson, Gilbert, Wolfort, Allen & Bierman, of St. Louis, Mo., for Central Hanover Bank & Trust Co.

Edward W. Bourne (of Alexander & Green), of New York City, and Fordyce, White, Mayne, Williams & Hartman, of St. Louis, Mo., for Bankers Trust Co.

Davis, Polk, Wardwell, Sunderland & Kiendl, of New York City, and Thompson, Mitchell, Thompson & Young, of St. Louis, Mo., for Guaranty Trust Co. of New York.

Milbank, Tweed & Hope, of New York City, and Nagel, Kirby, Orrick & Shepley, of St. Louis, Mo., for Chase Nat. Bank of City of New York, trustee.

Paul D. Miller (of Mudge, Stern, Williams & Tucker), of New York City, for Chase Nat. Bank of City of New York, creditor.

Alfred H. Phillips (of Chadbourne, Hunt, Jaeckel & Brown), of New York City, and Nagel, Kirby, Orrick & Shepley, of St. Louis, Mo., for Chemical Bank & Trust Co.

T. M. Pierce and S. Mayner Wallace, both of St. Louis, Mo., for Mississippi Valley Trust Co.

Root, Clark, Buckner & Ballatine, of New York City, for President and Directors of Manhattan Co.

James Piper and Piper, Watkins & Avirett (including Piper, Carey & Hall), all of Baltimore, Md., and Henry S. Caulfield and Clarence M. Barksdale, both of St. Louis, Mo., for E. Stanley Glines Committee.

Edward Greensfelder, of St. Louis, Mo., for Horace A. Davis, Benjamin S. Lichenstein and Sylvan Gotschal, a Committee on behalf of Holders of First Mortgage Bonds of Central Arkansas & Eastern R. Co.

Harry Hoffman, of New York City, for Joseph Dembitzer Committee and for Anglo-Continental Treuhand, A. G., and Mondiale Handels-und Verwaltungs, A. G., Bondholders, etc.

Tom R. R. Ely and Brandom Hope, both of St. Louis, Mo., for Joseph Dembitzer Committee.

Wayne Ely, of St. Louis, Mo., for Anglo-Continentale Treuhand, A. G., and Mondiale Handels-und Verwaltungs, A. G., Bondholders, etc.

Malcolm Mecartney and James J. Kilgallon, both of Chicago, Ill., and Malcolm I. Frank and Wm. R. Orthwein, Associate Counsel, both of St. Louis, Mo., for Mason B. Starring, Jr., and others.

Walter E. Meyer, of New York City, pro se and for other stockholders.

R. Walston Chubb, of St. Louis, Mo., for Walter E. Meyer.

Ben C. Dey, of San Francisco, Cal., Geo. L. Buland, of New York City, and Claude O. Pearcy, of St. Louis, Mo., for Southern Pac. Co.

Thomas F. McDonald, of St. Louis, Mo., for Railroad Credit Corporation.

MOORE, District Judge.

The St. Louis Southwestern Railway Company, a Missouri corporation, the principal debtor in the proceeding, filed its petition in this Court on December 12, 1935, under Section 77, Chapter VIII of the Bankruptcy Act, 11 U.S.C.A. § 205, alleging that it was "unable to meet its debts as they mature, and that it desires to effect a plan of reorganization." On the same day, an order of the Court was entered approving the petition and a like petition of the St. Louis Southwestern Railway Company of Texas, a Texas corporation, subsidiary of the principal debtor. Subsequently, on December 17, 1935, similar petitions of other subsidiary companies, Central Arkansas & Eastern Railroad Co., an Arkansas corporation, and Stephenville North and South Texas Railway Company, a Texas corporation, were filed and approved. On December 31, 1935, an order was entered finally approving the aforementioned petitions, overruling certain objections thereto and ordering debtors to retain custody and continue operation of their properties.

On January 3, 1936, Honorable Berryman Henwood was appointed Trustee of the properties of the several debtors. The appointment of the Trustee having been ratified by the I. C. C., as is provided by Subdivision c (1) of Section 77, the appointment was made final January 29, 1936; Judge Henwood has continued to serve as Trustee to the present time.

On February 6, 1937, the Court divided the creditors and stockholders of the debtors into 22 classes, as is set forth in the Commission's Report, 249 I. C. C. 7, 8.

The debtor, popularly known as the Cotton Belt, operates railway lines with eastern termini at St. Louis, Missouri, and Memphis, Tennessee, and extending to Shreveport, Louisiana, and points in Texas, including Dallas, Fort Worth, Waco and Corsicana. We will not describe the system in further detail here except to mention that it connects with the lines of the Southern Pacific at Shreveport and Texas points; the system is fully described in the Commission's report, 249 I. C. C. 9.

The debtor filed its proposed plan of reorganization with the I. C. C. on December 7, 1936. Other proposed plans were submitted to the Commission as follows: On March 15, 1937, the plan of the Chase National Bank of the City of New York and the Mississippi Valley Trust Co., holders of debtor's collaterally secured notes; and on April 22, 1937, the plan of a protective committee for holders of debtor's first terminal and unifying bonds, said committee being headed by E. Stanley Glines. In addition to these plans, suggestions were filed by the Southern Pacific, owner of a majority of debtor's common and preferred stock and also a creditor of the debtor; and by Anglo-Continentale Treuhand, A. G., and Mondiale Handels-und Verwaltungs, A. G., foreign holders of debtor's first terminal and unifying bonds not represented by the Glines Committee. The names of other parties who intervened in the proceedings are given in the Commission's Report, 249 I. C. C. 6, 7. Hearings on the proposed plans were held from March 16, 1937, until April 24, 1937; additional hearings devoted solely to the objections of Walter E. Meyer, a minority stockholder, were held from May 5, 1939, until May 27, 1939, and from September 18, 1939, until September 30, 1939.

Under date of June 30, 1941, the Commission submitted its report and order approving a plan of reorganization for debtor. Thereafter, within the period of 60 days permitted by the statute, Section 77 sub. d, various petitions for modification of the plan were filed with the Commission and in accordance therewith the Commission, after further consideration of the record but without further hearings, issued its supplemental report and order under date of March 9, 1942. Objections were filed, arguments and briefs presented in the District Court, and the plan was under submission to Judge Davis at the time of his death. Some additional time has elapsed because of the necessity of presenting the matter anew to this Court and in order to allow this Court to attain proper familiarity with the matter before passing judgment.

The plan reported on March 9, 1942, to be effective as of January 1, 1942, approved a total capitalization of $75,000,000, as did the plan first reported by the Commission; only minor modifications were made in the plan after the Commission reconsidered it. The proposed capitalization eliminates the equities of the common and preferred stockholders and leaves $8,243,764.00 of creditors' claims unsatisfied. 252 I. C. C. 361. One-half of the total capitalization proposed is to be funded debt, one-fourth preferred stock and the remaining one-fourth, common stock. The plan contemplates leaving debtor's first mortgage and certain underlying mortgages undisturbed. New securities to be issued consist of a single bond issue, preferred and common stock. The proposed new bond issue would be a 4% consolidated mortgage, due 1992, covering, in general, the combined liens of the several issues to be retired, subject to the liens of the undisturbed securities. The issue is unlimited in amount but for reorganization purposes is limited to $14,687,700 for distribution to claimants, plus $1,500,000 issued to the treasury of the reorganized company to provide for contingencies. Sinking fund provisions, valuable to the holders of these bonds, are likewise provided. A more detailed discussion of the issue will be found in the Commission's report, 249 I. C. C. 168—170. An issue of 600,000 shares of $100 par value preferred stock is proposed, paying a 5% annual dividend, cumulative to the extent earned. This stock carries certain voting privileges which will be treated of more fully infra. Of the total issue, 187,500.22 shares are authorized to be issued to claimants in reorganization. A 750,000

share issue of $100 par value common stock is provided, 187,503.39 shares of which are to be issued in reorganization and 187,500.22 earmarked for conversion of preferred stock. See Appendix A hereto for a table showing allocation of the reorganization securities.

### Undisturbed Securities.

The provisions providing for certain obligations to remain undisturbed in the reorganization are not opposed by any of the parties. These undisturbed obligations include, in addition to debtor's first mortgage: 4½% equipment-trust certificates in principal amount of $216,000, issued in 1930, the same being secured by a lien on ten locomotives which cost $1,103,464; the entire issue of 5% first mortgage bonds of the Gray's Point Terminal Railway Company, due 1947, in the amount of $500,000, being secured by a lien on 13.25 miles of main line between Illmo and Delta, Missouri; the entire issue of 5% first mortgage bonds of the Shreveport Bridge & Terminal Co., due 1955, in the amount of $450,000, being secured by a first lien on a bridge across the Red River at Shreveport, La.; trust certificates of the Texarkana Union Station, operated by debtor jointly with other railroads, bearing 5% and assumed by debtor in the amount of $315,000. Debtor's note to the Railroad Credit Corporation, principal and accrued interest amounting to $1,331,300, which is secured by collateral found by the Commission to be worth $4,078,675, is satisfied by an issue of 10-year 4% Serial Notes and is, in effect, undisturbed. Interest payments on all of the foregoing, as well as on debtor's First Mortgage bonds, have been kept current at all times.

The 4% First Mortgage bonds due 1989, outstanding in the principal amount of $20,000,000, are secured by a first lien on 1,140.4 miles of main line (of a total of 1,151.82 miles of main line operated by the several debtors) as well as considerable branch-line mileage. Studies of the Commission showed that, as of 1935, over 75% of the net ton miles of freight carried by the system was borne by the lines subject to the first mortgage, and that earnings allocable to those lines were 3.95 times the interest requirements of the first mortgage bonds. See 249 I. C. C. 18–20. The only objection to leaving this issue undisturbed was made by the Security Research Bureau, which contended for a segregation of earnings allocable to three first liens of three independent companies which were merged in the principal debtor's first mortgage. See 249 I. C. C. 152–154. This contention was effectively disposed of in Glines v. Henwood, 8 Cir., 103 F.2d 226, which held that the present first mortgage is a blanket lien on the three originally independent properties.

The principal amount of the several obligations left undisturbed thus totals $22,-812,300. Since the Commission determined that the funded debt of the reorganized company should amount to $37,500,000, that is, one-half the new capitalization (249 I. C. C. 160), this leaves $14,687,700 to be distributed to other lienholders in the form of new consolidated mortgage bonds.

### Second Mortgage Bonds.

The first distribution of the new bonds is made in exchange for the principal and interest claims on the 4% second mortgage bonds of debtor due 1989. These are secured by a second lien on the same property that supports the first lien of the first-mortgage bonds. The freight traffic density on these lines was noted supra. It is also observed that the gross earnings of these lines were 2.63 times the interest requirements of the second mortgage bonds (see 249 I.C.C. 20). As of January 1, 1942, principal on the outstanding bonds of this issue amounted to $10,000,000 and accrued interest $2,200,000. New consolidated bonds in amount of $12,200,000 are to be issued to this class under the plan of reorganization.

The new bonds are superior to the second-mortgage bonds in that the lien of the new bonds covers some property not subject to the lien of the older issue, and also in that provision is made for a sinking fund in the new issue, while there was no such provision in the 2nd mortgage indenture. Furthermore, the obligation to pay interest is fixed by the indenture of the new issue, whereas the 2nd mortgage bond was originally an income bond, the obligation to pay interest thereon having become fixed only by the creation of junior fixed interest bonds. On the other hand, the new issue has a slightly later maturity date, 1992 as compared to 1989, and the new issue is larger in amount than the old, the balance of the new issue being distributed to junior lienors; and the fact that the new issue is "open-ended" makes possible further dilution of the 2nd mortgage-holders' share. However, it should

be noted that future issues of consolidated-mortgage bonds are subject to reasonable restrictions. See 249 I.C.C. 169, 170. The Bankers Trust Company, trustee under the second-mortgage indenture, appears in these proceedings in behalf of the bond-holders and urges approval of the plan of reorganization. As applied to the 2nd mortgage bonds, we think the plan is fair and equitable and accords these lienors full recognition of their rights including full priority treatment, as required by Ecker v. Western Pac. R. Corp., 318 U.S. 448, 63 S.Ct. 692; Group of Investors v. Milwaukee R. Co., 318 U.S. 523, 63 S.Ct. 727; Northern Pac. Ry. Co. v. Boyd, 228 U.S. 482, 33 S.Ct. 554, 57 L.Ed. 931; Case v. Los Angeles Lumber Prod. Co., 308 U.S. 106, 60 S.Ct. 1, 84 L.Ed. 110; Consolidated Rock Products Co. v. Du Bois, 312 U.S. 510, 61 S.Ct. 675, 85 L.Ed. 982.

■ Only a portion of the second-mortgage bonds are outstanding in the hands of the public, to-wit: $3,042,500 in principal amount, which represents, with accrued interest, a claim of $3,711,850. The remainder of the issue is pledged to secure debtor's first terminal and unifying bonds. For the purpose of the reorganization, the pledgees are treated as owners of the pledged bonds and receive the securities allocable on account of the pledged bonds. Thus, of the $12,200,000 consolidated-mortgage bonds to be distributed to holders of second-mortgage bonds, $8,488,150 will actually go to holders of first terminal bonds by reason of their interest in the pledged second-mortgage bonds.

Part of the first terminal bond issue is, in turn, pledged to secure payment of debtor's 5% general and refunding bond issue, due 1990. $8,063,000 in principal amount of first terminal bonds are outstanding in the hands of the public, while $13,533,000 in principal amount are pledged to secure the refunding bonds. Here, too, the pledgees are treated as owners of the pledged bonds, and receive the new securities allocable to them. There was some question raised before the Commission regarding the validity of this pledge. Reference was made to the law of the State of Missouri, debtor's domicile, providing that "No corporation shall issue stock or bonds, except for money paid, labor done or property actually received, and all fictitious increase of stock or indebtedness shall be void". Const., Art. XII, Sec. 8,

Mo.R.S.A. This provision is also incorporated into § 5020, Rev.Stat.1939, Mo.R.S.A. The Commission ruled, citing authorities, that these provisions of the state law, even though applicable, are superseded by Section 20a of the Interstate Commerce Act, 49 U.S.C.A. 20a, and the pledge is valid. 249 I.C.C. 150; 252 I.C.C. 341. We affirm the Commission's ruling.

### First Terminal Bonds and Refunding Bonds.

To these two issues, the first terminal and the refunding, are apportioned the remaining consolidated bonds and all the preferred stock of the new company. Each issue is secured by various direct prior and junior liens and certain collateral liens, and the apportionment is made on the basis of a ratio determined by an evaluation of the several properties subject to the respective liens. The security of the first terminal bonds includes, in addition to the pledge of 2nd mortgage bonds noted above, a direct first lien on certain equipment, 35.58 miles of road, and terminal property at St. Louis and Fort Worth; a collateral first lien on the Gray's Point company property (the senior lien of which is undisturbed in the reorganization as noted above) and on other property as set forth in the Commission's report, 249 I.C.C. 16. In addition, this issue is secured by a third lien on the bulk of debtor's property subject to the first and second mortgages. The security of the refunding bonds includes a direct first lien on 138.58 miles of road, a collateral first lien on 37.3 miles, a direct second lien on property subject to first terminal's senior lien, and a fourth lien on the bulk of debtor's property.

The method for allocation of the residue of new bonds was as follows: the Commission found the property supporting the first and second mortgages to be worth $50,582,152; the amount of new bonds to be issued against this property is $32,200,000. The ratio derived from these two figures is applied to allocation of new bonds on account of lien on any other property equal in quality to that supporting the first and second mortgage liens. The property supporting the Gray's Point Terminal bonds (supra) was deemed to be of such quality, and its value was set at $1,366,877. Applying the above ratio, the Commission determined that this property should therefore support a bond lien of $870,138. Since $500,000 of bonds against this property stand undisturbed (supra), $370,138 is

left to satisfy the first collateral lien of the first terminal bonds attaching to this property.

This distribution of $370,138 of Consolidated-Mortgage bonds leaves $2,117,562 to be apportioned between the first-terminal bondholders and the refunding bondholders on the basis of their respective liens. The Commission then determined that properties subject to the liens of the two issues were of the following values:

| | Direct Lien | Collateral Lien | Total |
|---|---|---|---|
| First Terminal & Unifying............ | $2,426,366 | $2,341,127 | $4,767,493 |
| General & Refunding Mortgage......... | 2,813,643 | 616,074 | 3,429,717 |

Apportioning the remaining $2,117,562 of consolidated-mortgage bonds in the ratio of the two figures in the right-hand column above results in an allocation of $1,231,573 to holders of first-terminal bonds and $885,989 to holders of refunding bonds. The remainder of the first terminal claim is satisfied by a dollar for dollar allocation of new preferred stock. (The figures in Appendix A indicate that the claim is satisfied only to the extent of 99.1% of its full amount; the apparent discrepancy is accounted for by the fact that $278,300 is payable in cash to this class on account of January 1 and July 1, 1936 interest on the 2nd mortgage bonds pledged to secure the first terminal issue.)

The privately owned first terminal bonds are represented in these proceedings in two groups; the protective committee under the chairmanship of E. Stanley Glines represents some two million dollars worth of outstanding bonds. They favor the plan of reorganization and urge its adoption. The other group comprises foreign holders of first terminal bonds amounting to somewhat over a million and one-half dollars in principal amount, who formed themselves into a committee headed by Joseph Dembitzer. Because these foreign bondholders are residents of occupied European countries, they are no longer in communication with their domestic representatives and their present status is unknown. It has been suggested that this group no longer exists as a group. This would lead to the inference that these persons are no longer properly before the court. We will not entertain such a suggestion or inference.

In behalf of the foreign bondholders certain objections have been pressed, both before the Commission and before the Court,

based on the following facts and allegations:

(a) That property subject to their first lien is now merged into the lien of the new consolidated mortgage.

(b) That they have been deprived of the benefit of a clause in their indenture, requiring discarded equipment subject to the lien to be replaced.

(c) That the new issue bears a lower interest rate than the old (4% as compared to 5%) and has a later maturity date (1992 as against 1952).

(d) That they are deprived of their third lien on debtor's road.

(e) That the preferred stock is an inferior security.

(f) That the value of the properties subject to their liens is allegedly far in excess of the value of the new bonds received.

(g) That the earning power of the properties subject to their liens is allegedly sufficient to justify a greater allocation of securities.

(h) That the creditor's claim of the Southern Pacific (majority stockholder) should be subordinated to the claims of all other creditors. This adopts the position of Walter E. Meyer, a minority stockholder, and the point will be discussed below when Mr. Meyer's objections are treated.

The rationale of the foreign bondholder's whole position, necessary in order to bring their case within the rule followed in the Milwaukee case, supra, is that the general and refunding bonds, said to be a junior issue, and likewise certain creditors whose rights are said to be wholly subordinate to those of the first terminal bonds, are likewise participating in the allocation of consolidated-mortgage bonds and preferred stock. This is fallacious; the general and refunding bonds are not wholly junior to the first terminal bonds but enjoy prior liens on certain properties, as noted above. See, also, description of liens, 249 I.C.C. 16–18 and allotment of securities based thereon, 252 I.C.C. 356–358. Thus, as between the first terminal and the refunding bonds there

has been no confiscation of the rights of either one in favor of the other. Likewise, the Southern Pacific as a creditor, the Chase National Bank and the Mississippi Valley Trust Company each hold notes (past-due) secured by pledges of general and refunding bonds. In the reorganization each of these creditors is treated as owner of the pledged bonds (and properly so, we think) and their right to new securities is based on their ownership of bonds, not because of their principal debts.

It is true that the first terminal bonds have lost seniority because certain prior liens they enjoyed have been merged into the lien of the new consolidated-mortgage. But their prior liens were on a relatively small amount of property, while their blanket lien was only third in order of seniority. The liens of the new bonds in which they participate is a direct second lien on all the property covered by the first mortgage, and also covers the prior liens formerly enjoyed by the refunding bonds as well as those enjoyed by the first terminal bonds. This more valuable lien, together with the sinking fund provisions, we believe adequately compensates the first terminal bonds for what they have yielded; their prior liens, their higher interest rate and their earlier maturity date. We are also of the opinion that rights attaching to the preferred stock, paying a dividend of 5% cumulative to the extent earned, given for the balance of their security allotment, are adequate compensation for the rights yielded. By the terms of the plan of reorganization, the preferred stock has voting power equal to that of the common stock at all times and in addition has power to elect a majority of the board of directors of the reorganized company until the maximum dividend shall have been paid for three consecutive years, and thereafter whenever any accumulated dividend shall have remained unpaid for twelve months. The right to elect a majority of the board revives whenever dividends shall not have been paid for three consecutive years, or whenever accumulated unpaid dividends shall amount to 10% or more. Furthermore, the preferred stock is convertible into common at any time, at the option of the holder.

The argument that the first terminal bonds should receive an allotment of bonds equal to the "value" of the properties subject to their direct lien is likewise fallacious. The Commission made no pretense that the values stated (supra) are the values of the properties referred to for the purposes of the reorganization or that the liens against those properties were of the values stated. In the absence of other criteria, the Commission merely used the values based on reproduction cost, less depreciation, of the various properties subject to the respective liens of the first terminal, and of the refunding bonds, to fix a ratio for the allotment of the remaining new bonds to those lienholders. We think this procedure was fair and equitable to the parties involved.

The claim that the allotment of new securities does not adequately reflect the earning power of the properties subject to the former lien is equally fallacious. The basis of this is the Commission's finding (249 I.C.C. 20) that the earnings of this mortgage are 1.62 times interest requirements, while the earnings of the refunding bonds just equal interest requirements. The first terminal bondholders have been accorded preferment over the refunding bondholders in the allocation of preferred stock between the two and this accords full recognition to the higher earning power of property subject to their former liens.

The foreign bondholders also argue that their former lien, as applied to certain equipment, was supported by a replacement clause which was not fully honored by debtor. They contend that the security to which they were rightfully entitled has been diminished, and for this they claim additional compensation. This objection was also made before the Commission, but petitioners failed to prove their case. 249 I.C.C. 162, 163. We think the matter was properly and effectively disposed of by the Commission.

We determine, in view of all the facts, that as to this class of creditors, the plan is fair and equitable, is not discriminatory and affords due recognition to their rights, including the right to full priority treatment, as outlined in cases cited supra. We think the demands of this group are well answered by the statement of Mr. Justice Douglas in the Milwaukee case, supra, loc.cit. 565 of 318 U.S., loc.cit. 749, of 63 S.Ct.

"It is sufficient that each security holder in the order of his priority receives from

*that which is available for the satisfaction of his claim* the equitable equivalent of the rights surrendered. That requires a comparison of the new securities allotted to him with the old securities which he exchanges to determine whether the new are the equitable equivalent of the old. But that determination cannot be made by the use of any mathematical formula. Whether in a given case senior creditors have been made whole or received 'full compensatory treatment' rests in the informed judgment of the Commission and the District Court on consideration of all relevant facts." (Emphasis supplied).

### Stephenville Bonds
### and
### Central Arkansas Bonds.

The debtor's remaining bond issue, the 5% general and refunding mortgage, due 1990, has already been discussed in part supra. To this issue is allocated what remains of the bonds and preferred stock proposed under the plan of reorganization after all of the foregoing interests are accommodated. In addition, all but $5,000,000 of the authorized $18,750,000 of common stock is allotted to this class. The five million dollars represents the approximate value of debtor's free assets and is to be apportioned between the holders of the refunding bonds, holders of Stephenville North and South Texas Railway Company first mortgage bonds, and holders of Central Arkansas & Eastern Railroad Company first mortgage bonds, in proportion to the amounts of the unsatisfied claims of the respective groups. The Stephenville and the Central Arkansas companies are both wholly owned by debtor, and their respective bonds are guaranteed as to principal and interest by debtor. The claim of the Stephenville bonds amounts to $2,423,000; that of the Central Arkansas bonds $1,085,000; and the claim of the refunding bondholders lacks $6,661,187 of full dollar for dollar satisfaction after the distributions outlined supra. The properties of these two subsidiaries have been abandoned, the salvage values of the property have been realized and the bondholders are entitled to payment of that salvage value. The Commission has accordingly reduced the claim of the Stephenville bonds by the amount of salvage realized on that property to $2,256,882 for the purpose of this allocation: in like manner, the claim of the Central

Arkansas bonds was reduced to $932,232. Thus the $5,000,000 of common stock has been allocated as follows: $3,381,210 to refunding bondholders, $1,145,590 to Stephenville bondholders and $473,200 to Central Arkansas bondholders. It is urged in behalf of the latter two that their position is that of unsecured creditors of the debtor, that they are entitled to prove the full amount of their claim, unreduced by the amount received upon liquidation of security not the property of the debtor, and that, therefore, they should receive an allotment of stock based on the full amount of their claim. Section 1, subsection 28 of the Bankruptcy Act, 11 U.S.C.A. § 1, provides:

"(28) 'Secured creditor' shall include a creditor who has security for his debt upon the property of the bankrupt of a nature to be assignable under this Act or who owns such a debt for which some endorser, surety, or other person secondarily liable for the bankrupt has such security upon the bankrupt's assets."

But where the creditor has for security property other than that of the principal debtor in addition to the latter's promise to pay, the creditor is unsecured as to the principal debtor and may prove the full amount of his claim, unreduced by any set-off for amount realized upon liquidation of the security (Ivanhoe B. & L. Ass'n v. Orr, 295 U.S. 243, 55 S.Ct. 685, 79 L.Ed. 1419), and the rule applies even though the security consists of property of a wholly-owned subsidiary of the principal debtor, In re United Cigar Stores Co., 2 Cir., 73 F.2d 296. This point was raised before the Commission and attention was called to the Ivanhoe case. We agree with the Commission that the conclusion urged does not necessarily follow from the rule of that case. The rule is applicable here insofar as pertains to proof of the claims of these parties, but we do not think it compels the Court or the Commission, when allocating securities in a reorganized railroad company, to disregard the fact that a claimant has been partially reimbursed during the pendency of the proceedings. The obligation of debtor on the Stephenville bonds and the Central Arkansas bonds is that of guarantor and the obligation of a guarantor is reduced pro tanto by reduction of the principal debt. Mann v. Mt. Union, etc., Co., D.C.M.D.Pa., 267 F. 448; Pennsylvania Trust Co. v. McElroy, 3 Cir., 112 F. 509; In re Pulsifer, D.C., 14 F. 247;

Eddy v. Sturgeon, 15 Mo. 199; 38 C.J. 1245. The Commission thus justified its treatment of these parties and we think their disposition of the matter was fair and equitable. It is true that the allocation of new securities would leave these claimants partially unsatisfied even though it were based on the full amounts of their claims, and using the lesser amounts as a basis of computation reduces the degree of satisfaction still further. It must be borne in mind, however, that the other distributee, the refunding bondholder group, likewise lacks several million dollars of seeing its claim fully satisfied.

## Stockholders.

We have now to consider the objections of the preferred and common stockholders of debtor corporation. Their interests having been foreclosed under the proposed plan of reorganization, they urge that the matter be resubmitted to the I.C.C. for further consideration, alleging that changed circumstances arising since the Commission last considered the matter justify such reconsideration. The preferred stockholders are represented by a group comprising Mason B. Starring, Jr., and others, owners of 770 shares; the Southern Pacific company appears as the owner of a majority of debtor's common and preferred stock; the debtor itself appears in behalf of the proprietary interest in the company; and Walter E. Meyer, a minority holder of common stock, appears for himself and in behalf of others similarly situated.

The last-named relies only partially on recent improvements in the debtor's financial position as a basis for his objections to the plan, and charges principally that mismanagement by the Southern Pacific and preceding controlling interests over a period of years has depressed debtor's earnings; that debtor's financial distress was the result solely of such mismanagement.

Meyer's contention is that the debtor's earnings since 1925 have been depressed by interests in control using the debtor as a pawn in a game to suit their own ends without regard to debtor's welfare. For the period 1925 to 1932 debtor was controlled variously, it is alleged, by Chicago, Rock Island & Pacific, Kansas City Southern, Southern Pacific and New York Investors, Inc. It is said that debtor was wrongfully deprived of the opportunity to make earnings of some 17 million dollars per year in addition to what the road actually earned. For the period 1932 to 1935 the Southern Pacific was in control of debtor and it is alleged that a like situation prevailed. It is contended that the controlling interest owed a fiduciary duty to the minority stockholders, which was violated. In addition, contractual duties arising out of an agreement between Southern Pacific and debtor, referred to as the Turney-Saunders agreement, are said to have been breached. This agreement took effect after January 1, 1933, shortly after the Southern Pacific acquired control of debtor, and provided that the debtor would preferentially solicit traffic to move via Southern Pacific lines, while the latter in turn agreed to solicit preferentially for debtor. The obligation of the Southern Pacific under the Turney-Saunders agreement was subject to limitations arising out of obligations of prior contracts made by the Southern Pacific with the Rock Island and with the Union Pacific, and was also subject to the provisos that routings would be such as to permit maximum revenue to the Southern Pacific system and that the Southern Pacific maintain fair interchange of traffic with other lines.

Specific examples of the alleged misfeasances are that the Southern Pacific solicited and routed traffic over the Southern Pacific and connecting lines competitive to debtor so as to yield the largest revenue for the Southern Pacific in preference to alternative routings over Southern Pacific's and debtor's combined lines; Southern Pacific caused debtor to enter into an agreement with the Illinois Central for interchange of traffic which is detrimental to debtor's best interests; Southern Pacific has interfered with debtor's relations with the Texas & Pacific (a line competitive to the Southern Pacific); Southern Pacific caused debtor to solicit traffic for interchange with the Southern Pacific in preference to solicitation of local hauls over its own lines which would have been more profitable; Southern Pacific conspired with debtor and others to violate the Clayton Act, 38 Stat. 730; Southern Pacific failed to solicit preferentially for debtor in other respects than those already mentioned; it attempted to injure debtor by impeding the refunding of a certain bond issue of debtor in 1932; the institution of these reorganization proceedings was a move to further Southern Pacific's own ends at the expense of the minority stock-

holders; Southern Pacific failed to prosecute alleged causes of action which debtor had by reason of alleged misfeasances by prior controlling interests; Southern Pacific refused to lease debtor's entire property; it failed to lend debtor money when the latter was in financial distress, although able to do so.

Meyer asks that the creditor's claim of the Southern Pacific Company be expunged, or at least subordinated to those of all other claimants. This action, if it were justified, might well result in allowing some equity for the present stockholders. However, at the time this Court ordered the filing of claims, opportunity was given to other parties to object thereto and Meyer did not avail himself of that opportunity. The group referred to above as the foreign bondholders did object to the allowance of Southern Pacific's claim and extended hearings on the objections were held before a special master. The report of the master, finding in favor of the claimant and against the objectors, is recorded in the permanent record of these proceedings, Vol. X, p. 5109-5123. Exceptions were taken to the Master's report, the objections were overruled and the claim allowed. While it does not appear that the issues raised by the objections are co-extensive with those raised by Meyer in his objections to the plan, he was a party in the reorganization proceedings and had the opportunity to object at that time. In view of this, together with other opportunities to have his day in court which Meyer has taken advantage of and which will be discussed infra, we think the matter is no longer open to question.

Meyer also asks that the reorganization provide for preservation in the hands of the Trustee of the alleged causes of action accruing to debtor. In view of the proceedings already undertaken at Meyer's instance, as outlined infra, we deem the request likewise without merit.

Except for his failure to press timely objections to the allowance of the Southern Pacific claim, Meyer has zealously pressed his charges throughout the proceedings, both before the Commission and before this Court. As we mentioned above, hearings devoted solely to his allegations, extending over a period of several weeks, were held by the Commission during the months of May and September of 1939. In addition, the matter was referred to the Bureau of Inquiry of the I.C.C. and the showing made there was deemed insufficient to justify the even more far-reaching inquiry demanded. The results of the investigation by the Board of Inquiry are included in the Commission's report, 249 I.C.C. 88-91. Prior to the time the debtor filed its petition instituting the reorganization and prior to the acquisition of control of debtor by the Southern Pacific, debtor was controlled by the Missouri-Kansas-Texas road which, in turn, was controlled by the Kansas City Southern. At that time, Meyer charged various derelictions of duty against the then management, the controlling interests and their bankers, Ladenburg, Thalmann & Co. and Kuhn, Loeb & Co. Certainly, as early as 1928, Meyer was an active participant in proceedings before the I.C.C. entitled Loree's Application, 145 I.C.C. 521, having to do with control of the M.-K.-T. lines by the Kansas City Southern. We will not endeavor to say what issues were raised by Meyer at that time, but the record here shows that acts of the parties then interested in debtor (including, also, the Chicago, Rock Island & Pacific) are coupled with alleged subsequent misfeasances and non-feasances of the Southern Pacific as a basis of Meyer's present charges. See 249 I.C.C. 61-76. Meyer also instituted a civil suit in the District Court of the Southern District of New York, Meyer v. Kansas City So. Ry. Co. et al., 11 F.Supp. 937, affirmed 2 Cir., 84 F.2d 411, certiorari denied 299 U.S. 607, 57 S.Ct. 233, 81 L.Ed. 448, against some ninety defendants, including the railroads and banking firms referred to above. The allegations made there included matter substantially like that submitted in these proceedings. The suit was dismissed for lack of jurisdiction.

Returning now to more recent events, Meyer's request for even further investigation by I.C.C. of certain of his charges was denied, the Commission stating, 249 I.C.C. 147:

"We are of the view that Meyer has had a full and fair opportunity to obtain and present evidence in support of his charges, and that such charges have been sufficiently investigated. The request for a reopening of the proceeding is denied.

"Meyer's sixth point is a request that we institute an investigation, and thereafter render a report, on the matters involved in this proceeding, including his allegation that Union Pacific, Illinois Central, and Kuhn, Loeb & Company influences on the

board of directors of the Southern Pacific were responsible for the alleged wrecking of the debtor. We are of the view that the investigations already made are sufficient, and that further investigation of any of the matters brought to attention by Meyer in this proceeding would serve no useful purpose. His request for further investigation is denied."

Upon institution of further proceedings, before the Commission, Meyer renewed his attack, asking that the entire matter be reopened and further investigation made. After considering all the arguments presented (252 I.C.C. 330–338) the Commission refused to grant any further hearings or allow any further investigation. Subsequently, when the plan of reorganization was finally reported to this Court, the late Judge Davis sitting, Meyer asked leave to present further evidence to support his various charges and objections to the plan. The plan having been reported by the Commission March 9, 1942, hearing on the plan originally set for June 15, 1942, was continued to October 26, 1942, on motion of Mr. Meyer to permit the taking of certain depositions (Petition No. 666 and Order No. 666 in this matter, permanent record of the proceedings, pp. 7743-7748). Subsequently, on Oct. 20, 1942, the Court denied Meyer's application for further continuance (Order No. 693, permanent record, p. 8031). At the time fixed by the Court some additional evidence was presented relative to alleged breach of the Turney-Saunders agreement, limited by the Court to the period of time subsequent to the Commission's consideration of the matter, and additional argument presented to the Court.

In addition to all of this, the Court and trustee have observed the requirements of subsection c (9) of Section 77, which provides:

"The judge shall direct the trustee or trustees, and may request the Commission through such of its agencies as it may designate, to report to him any facts pertaining to irregularities, fraud, misconduct, or mismanagement, as a consequence of which the debtor may have a cause of action arising therefrom against any person or corporation."

On February 24, 1936, the Court made Order No. 34 in these proceedings (permanent record, p. 305) requiring the trustee to report irregularities, etc., as provided in the above section of the statute. In compliance with said order, the trustee corresponded with all the parties to these proceedings, seeking advice and information in the premises, and made annual reports to the Court on the dates of February 24, 1937, February 25, 1938, March 2, 1939, April 5, 1940, March 21, 1941, April 23, 1942, and March 7, 1943. Examination of these reports shows that the trustee's whole efforts along this line were devoted to investigation of Meyer's charges. The Trustee was never able to find any basis for the institution of legal proceedings in behalf of the debtor against any of the parties accused, and we do not understand that Meyer accuses the trustee of any bad faith or lack of diligence in this respect. (Reference is made by the trustee to the following reports of other proceedings before the Commission, in which Meyer also seized opportunity to advance his theories concerning the debtor, its management (or alleged mismanagement) and its place in Southwestern transportation: Proposed Unification of Southwestern Lines, 124 I.C.C. 401; Interstate Commerce Comm. v. Kansas City So. Ry. Co., 156 I.C.C. 359; St. Louis Southwestern Ry. Co. Control, 180 I.C.C. 175). We believe that ample opportunity has been afforded to Mr. Meyer by the Commission and by the Court to present evidence in support of his various allegations and objections, and that the time elapsed during the pendency of these proceedings has afforded ample time for him to fully prepare his case. He has not convinced either this Court or the Commission that his charges are well-founded. The allegations against the Southern Pacific outlined herein were before the Commission and were considered by it. See 249 I.C.C. 46-149 and 252 I.C.C. 330–338 for the Commission's discussion, findings and conclusions on the various points raised by Meyer. The possibility of a lease, urged by Meyer and favored by Chairman Eastman in his dissent to the Commission's report (249 I.C.C. 191, 192), is not precluded by consummation of the reorganization but was not deemed by the Commission to be feasible as a means of avoiding reorganization. The Commission's report states, 249 I.C.C. at 58:

"As to the possibilities of a lease of the debtor by the Southern Pacific, as an alternative to reorganization, it appears that such an arrangement, or a consolidation of the properties, holds promise of large sav-

ings in operating expenses, with the further promise of some increase in traffic. The Southern Pacific apparently is of the view that saving in expense and increase in traffic would not be sufficient in amount to justify it in assuming the obligation of the debtor's fixed charges at their present level. It cannot be said in the light of the record that this view of the Southern Pacific is unreasonable. *A possible lease cannot under the present law be forced on the Southern Pacific.* Such a unification of operation is a step that may follow reorganization of the debtor, rather than the means by which a reorganization otherwise clearly necessary might be avoided. *In any event it could not be accomplished without giving the States involved and the general public opportunity to be heard on the reasonableness of the terms and the underlying question of public interest."* (Emphasis supplied.)

The question of the feasibility of a lease is, of course, a matter within the exclusive jurisdiction of the I.C.C. 49 U.S.C.A. § 5. This, as well as a determination of the validity of Meyer's charges of bad faith are matters requiring study by experts on railroad affairs, involving, as they do, expert analysis of traffic movements, freight loadings, financial statements, and other data peculiarly within the comprehension of the I.C.C. We are of the opinion that the Commission has had full opportunity to pass on these matters and exercise informed judgment. We are, therefore, not disposed to refer the plan back to the Commission on this account and, accordingly, overrule Meyer's objections to the plan of reorganization.

The sole issue remaining to be considered depends principally upon the recent prosperity of the road, which is in sharp contrast to its record during the 1930's. That this calls for reconsideration of the plan is urged by Meyer, in addition to his other points, and is argued more fully by the Southern Pacific and the debtor itself. Three principal points are urged: (1) that the earnings of debtor during 1941, 1942 and 1943 throw new light on debtor's earning power and ought to be considered by the Commission; (2) that recent accretions to assets in the form of cash and improvements of the road's physical condition result in a valuation of debtor's property sufficient to support all outstanding obligations and leave an equity for the stockholders; (3) that the trade

area served by debtor is growing in wealth and population, so as to justify a prognostication of future prosperity for the road and likewise justify a higher capitalization. The last item is highly speculative and cannot of itself alter our decision on the plan.

The stockholders further contend that not only do recent earnings justify re-submission of the plan to the Commission, but that debtor's past history as well justifies a higher valuation and capitalization than has been approved by the Commission. In this respect, we find the rules by which our action is to be guided well-stated by Mr. Justice Reed in the Western Pacific opinion, supra:

"The power of the court does not extend to participation in all responsibilities of the Commission. Valuation is a function limited to the Commission, without the necessity of approval by the court. * * *

"The language chosen leaves to the Commission, we think, the determination of value without the necessity of a reexamination by the court, when that determination is reached with material evidence to support the conclusion and in accordance with legal standards. It leaves open the question of whether in reaching the result the Commission had applied improper statutory standards.

\* \* \* \* \*

"Thus, while judicial review does not involve an independent examination into valuation, it does require that the court shall be satisfied, upon the record before the Commission, with such additional evidence as may be pertinent to the objections to the Commission's finding of value, that the statutory requirements have been followed." Loc.cits. 472, 473 of 318 U.S., loc. cit. 707 of 63 S.Ct.

"Another restriction on court action is that the determination as to whether the plan is 'compatible with the public interest' rests, as valuation does, with the Commission. Subsection d. Without attempting to forecast the limits of the phrase as used in the setting of this statute, it is sufficient in this case to determine, as we do, that it includes the amount and character of the capitalization of the reorganized corporation.

\* \* \* \* \*

"The development of the capitalization of the reorganized company which is entrusted solely to the Commission under the requirement that the plan be compatible

with the public interest is that relating to the total amount of issuable securities and the quality of the securities to be issued. So long as legal standards are followed, the judgment of the Commission on such capitalization is final." Loc.cits. 473, 474 of 318 U.S., loc.cit. 707 of 63 S.Ct.

Following is a table of debtor's earnings over a considerable period of time, as shown by debtor's books, and also the figures for certain years as adjusted by the Bureau of accounts in order to correct deviations from the Commission's approved accounting method:

63 S.Ct.) nor do we understand that its conclusion need be controlled by averaging past earnings. We are satisfied that the Commission acted properly and not arbitrarily.

With respect to recent earnings of the road, it is argued that debtor's record is far superior to that of other roads where plans of reorganization eliminating the stockholders have been approved despite swollen war-time earnings, notably the Western Pacific; Chicago, Milwaukee, St. Paul & Pacific; Chicago & Northwestern, and Akron, Canton & Youngstown. For

Earnings Available for Fixed Charges.

| Year | Per Debtor's Books | As Adjusted |
|---|---|---|
| 1921 | $4,952,949 | |
| 1922 | 4,708,745 | |
| 1923 | 5,929,628 | |
| 1924 | 5,028,749 | Not |
| 1925 | 5,057,460 | |
| 1926 | 5,072,628 | determined |
| 1927 | 4,692,923 | |
| 1928 | 4,382,449 | |
| 1929 | 3,714,052 | |
| 1930 | 2,380,379 | $1,536,852 |
| 1931 | 2,710,861 | 2,054,552 |
| 1932 | D 125,857 | D 536,905 |
| 1933 | 1,840,184 | 1,319,654 |
| 1934 | 2,024,891 | 1,035,344 |
| 1935 | 2,695,111 | 2,216,705 |
| 1936 | 3,333,242 | |
| 1937 | 2,304,505 | |
| 1938 | 2,088,299 | Not |
| 1939 | 1,199,157 | |
| 1940 | 2,860,221 | determined |
| 1941 | 7,495,940 | |
| 1942 | 8,692,636 | |

It will be noted that the adjustments made were generally downward in substantial amounts.

The stockholders argue that the Commission placed undue emphasis on the depression years, 1930–1940. It is true that particular mention was made of those years (249 I.C.C. 159), and that the period 1927-1936 was likewise given special mention in the Commission's report (249 I.C.C. 11), but the Commission considered, and based its conclusions upon, the entire record. 249 I.C.C. 159, 252 I.C.C. 356. The Commission is not required in its report to "formalize in findings the numerous data on which it relied" (Milwaukee case, supra, loc.cit. 539 of 318 U.S., loc.cit. 737 of

example, our attention is called to a table published July 6, 1942, in Barron's Financial Weekly, showing comparative gross revenues of railroads for the years 1929 and 1942. This shows an increase of 44% in the later year over the earlier for debtor, but a decrease of 11.5% for the Milwaukee road and a decrease of 23.8% for Chicago & Northwestern. On the other hand, Western Pacific shows an increase of 58.2%. Of course, these isolated figures carry little weight of themselves, but serve only to call attention to the fact that each case must be judged on its own merits.

Examining the progress of other railroad reorganization proceedings we do,

however, note what appears to be a statement of policy of the Commission with regard to consideration to be given war-time earnings. In its Fourth Supplemental Report in the New York, N. H. & H. R. Co. Reorganization, Finance Docket 10992, 254 I.C.C. 405, 406, the Commission said:

"While the earnings for the year 1942 appear to have exceeded the estimates referred to in our third supplemental report, we do not consider the economic conditions which made them possible to be of such a permanent character as to warrant increasing the total capitalization of the reorganized principal debtor heretofore approved by us. Neither do we believe that the approved (sic) cash position of the principal debtor, nor the reduction of its liabilities, justifies an increase in the total approved capitalization."

And in the proceedings for reorganization of Denver & Rio Grande Railroad Co., Finance Docket No. 11002, 254 I.C.C. 349, a petition to re-open the record before the Commission account of recent earnings was denied in a report dated June 14, 1943. We think it was reasonable for the Commission to refrain from basing its prediction of debtor's prospective earning power on any consideration of the unusual conditions now prevailing. "As some of the bondholders point out, the bulge of war earnings per se is unreliable for use as a norm unless history is to be ignored; and numerous other considerations, present here as in normal years, make them suspect as a standard for any reasonably likely future normal year." Milwaukee case, supra, loc.cit. 543 of 318 U.S., loc.cit. 739 of 63 S.Ct.

At the time of rendering its supplemental report, the Commission had before it available figures on operations for the greater part, if not all of 1941, the first of the war-boom years, and it determined that fixed charges should be limited to $1,500,000 per year, capitalization to $75,000,000. These determinations are the province of the Commission and in view of its disposition of the New Haven and D. & R. G. matters, supra, it appears unlikely that the Commission would change these figures in the light of 1942 and 1943 earnings, even if given the opportunity to do so; nor do we think the law would require it to do so.

The stockholders also allege that there has been an increase in the value of debt-or's assets sufficient to allow them an equity in the company. The Commission's Bureau of Valuation, pursuant to Section 77, subsection c (11) appraised the road and equipment, as of the date of debtor's petition, at $68,523,903, and noted that deferred maintenance amounting to $3,173,-500 had accumulated. Evidence has been presented to show that this undermaintenance has now been restored, that additions and betterments amounting to $1,197,136 have been made since the Commission's appraisal, and that there are cash items now carried on the books aggregating $12,-436,417, and miscellaneous assets amounting to $4,843,596. The total of these items, less $899,900 set aside as working capital, yields a figure of $89,274,652 for total assets. As of the date these figures were calculated (Aug. 31, 1942) claims allowed plus accrued interest amounted to $84,178,418, indicating an equity of over five million dollars for the stockholders.

In considering the stockholders' contentions, it should always be kept in mind that the supplemental report of the Commission was issued on March 9, 1942, a fairly recent date and a date on which much of the change relied on here had already occurred or was apparent from the circumstances prevailing. We must further keep in mind the fact that the law we are dealing with places principal emphasis on earnings with considerably less weight given to balance sheet figures. Section 77 sub. e provides in part that the "value of any property used in railroad operations shall be determined on a basis which will give due consideration to the earning power of the property, past, present, and prospective, and all other relevant facts. In determining such value only such effect shall be given to the present cost of reproduction new and less depreciation and original cost of the property, and the actual investment therein, as may be required under the law of the land, in light of its earning power and all other relevant facts." In the Milwaukee opinion, loc. cits. 540, 541 of 318 U.S., loc. cit. 738 of 63 S.Ct., Mr. Justice Douglas construed the law as follows:

"We recently stated in Consolidated Rock Products Co. v. Du Bois, supra, in connection with a reorganization of an industrial company that the 'criterion of earning capacity is the essential one if the enterprise is to be freed from the heavy hand of past errors, miscalculations or dis-

aster, and if the allocation of securities among the various claimants is to be fair and equitable.' Page 526 of 312 U.S., page 685 of 61 S.Ct., 85 L.Ed. 982. That is equally applicable to a railroad reorganization. * * * The basic question in a valuation for reorganization purposes is how much the enterprise in all probability can earn. Earning power was the primary test in former railroad reorganizations under equity receivership proceedings. Temmer v. Denver Tramway Co., 8 Cir., 18 F.2d 226, 229; New York Trust Co. v. Continental & Commercial Bank, 8 Cir., 26 F.2d 872, 874. The reasons why it is the appropriate test are apparent. A basic requirement of any reorganization is the determination of a capitalization which makes it possible not only to respect the priorities of the various classes of claimants but also to give the new company a reasonable prospect for survival. See Commissioner Eastman dissenting, Chicago, M. & St. P. Reorganization, 131 I.C.C. 673, 705. Only 'meticulous regard for earning capacity' (Consolidated Rock Products Co. v. Du Bois, supra, 312 U.S. page 525, 61 S.Ct. page 685, 85 L.Ed. 982) can afford the old security holders protection against a dilution of their priorities and can give the new company some safeguards against the scourge of overcapitalization. Disregard of that method of valuation can only bring, as stated by Judge Evans for the court below, 'a harvest of barren regrets.' [Chicago, M., St. P. & P. R. Co. v. Group of Institutional Investors, 7 Cir.], 124 F.2d [754], page 765. Certainly there is no constitutional reason why earning power may not be utilized as the criterion for determining value for reorganization purposes. And it is our view that Congress when it passed § 77 made earning power the primary criterion. The limited extent to which § 77 sub. e provides that reproduction cost, original cost, and actual investment may be considered indicates that (apart from doubts concerning constitutional power to disregard them) such other valuations were not deemed relevant under § 77 any more than under § 77B * * * 'except as they may indirectly bear on earning capacity'. Consolidated Rock Products Co. v. Du Bois, supra, 312 U.S. page 526, 61 S.Ct. page 685, 85 L.Ed. 982."

▮ Taking direct issue with the figures cited by the objectors, supra, we do not think that they justify resubmission of this plan to the Commission for the reasons: first, that cash items bulk large in the recent balance sheets, but these do not necessarily add anything to the road's earning power and, furthermore, there is always the likelihood that they may be dissipated by events not now foreseen; second, the showing of restoration of undermaintenance does not relieve the doubt that the physical condition of the road may be adversely affected by inability to make proper replacements and repairs during wartime—the figures cited give no indication as to whether proper allowance for depreciation and maintenance has been made during recent years; third, the miscellaneous assets, listed at book value, are of doubtful worth and in the main consist of items showing on debtor's books at the time the property was appraised by the Bureau of Valuation.

The stockholders, by way of argument, point to the decision of this Court referring the plan of reorganization of the Missouri Pacific back to the Commission. In re Missouri Pac. Ry. Co., D.C., 50 F.Supp. 936. In that matter, we were of the opinion that re-submission of the plan to the Commission was necessary in order that consideration be given to the question of absolute priority treatment of lienors in accordance with the Western Pacific and Milwaukee decisions, supra. In addition, we particularly called the Commission's attention to recent changes in that debtor's earnings and financial position. Here, however, we find no justification for referring the plan back because of any claim of any of the lienholders; there remain only the arguments of alleged changes in circumstances arising since the plan was reported to the Court. We think the record of war-time earnings is inadequate to justify the relief sought in view of the Commission's position in the New Haven matter, supra, and the disposition of the Supreme Court indicated in the Western Pacific and Milwaukee cases, supra; considering the arguments pro and con with respect to the balance sheet figures, we conclude that the weight which ought to be given to assets, in determining debtor's valuation for the purposes of this reorganization, has not been materially altered since the date of the Commission's supplemental report.

▮ It is suggested alternatively that some consideration be given a plan permitting the stockholders to buy back

their equity in the company through the issuance of warrants to them. Even though it does not appear that the Commission considered this possibility, there is no constitutional requirement that it do so (Western Pacific case, supra, loc. cit. 476 of 318 U.S., 63 S.Ct. 692), and considering the time which has elapsed during the pendency of this proceeding and the opportunities the parties have had before the Commission to submit proposed plans of reorganization and to suggest alterations in the plan formulated, we do not think it requisite at this time to re-open the record on this account, especially in view of the fact that the issuance of warrants for common stock might well necessitate a revision of the plan as it affects present allocations of stock to lien-holders, as well as requiring revisions to accommodate unpaid creditors and to invest the new capital funds which might be anticipated.

Petitions for allowance of compensation for services rendered and for expenses (including fees of counsel) incurred in connection with the reorganization proceeding, up to and including June 15, 1942, were filed by the following persons, corporations and committees: Railroad Credit Corporation; Southern Pacific; Debtor, and its counsel; St. Louis Union Trust Company, Trustee, and its counsel; Central Hanover Bank & Trust Company, Trustee, and its counsel; Bankers Trust Company, and its counsel; Guaranty Trust Company of New York, Trustee, and its counsel; Chase National Bank of the City of New York, Trustee, and its counsel; Chemical Bank & Trust Company, Trustee, and its counsel; Chase National Bank of the City of New York, together with Mississippi Valley Trust Company, and their counsel; President and Directors of the Manhattan Company, Trustee, and their counsel; Equitable Life Assurance Society of United States; Metropolitan Life Insurance Company; Prudential Insurance Company of America; E. Stanley Glines, et al., a Committee, and their counsel; Horace A. Davis, et al., a Committee, and their counsel; Counsel for the foreign bondholders; and Mason B. Starring, Jr. et al., a Committee, and their counsel. The foregoing petitions were referred to the I. C. C. in accordance with Section 77, subsection c (12) for determination of maximum limits on allowances. The Commission in due course filed its report and order dated January 14, 1943, and amendatory order dated March 6, 1943, fixing limits for allowances to petitioners. Said petitions were submitted to the Court on, the record made before the Examiner for the I. C. C. On April 19, 1943, the Court, after consideration of the petitions and the record, made its findings of fact, conclusions of law and order, allowing fees and expenses within the limits fixed by the Commission, to the parties and in amounts as set forth in said order (permanent record, Vol. XVII, pp. 8445-8460), and reserving jurisdiction pending further developments to further consider the petitions of Joseph Dembitzer et al., and of Walter E. Meyer, and to make allowances for expenses and fees accruing subsequent to the date of the order.

Upon consideration of the entire record and of arguments of counsel of interested parties, orally and by brief, the Court is satisfied that the hearings before the Commission accorded to the parties appearing their full rights; that the findings made by the Commission as reported to this Court on June 30, 1941 and March 9, 1942, including its findings as to debtor's prospective earning power, the valuation and capitalization permissible for the purposes of this reorganization, are supported by the entire record, are not arbitrary and are in accordance with proper legal standards; that the legal conclusions stated by the Commission in said reports are in accordance with the law of the land. The plan of reorganization reported by the Commission in its report dated June 30, 1941 and its supplemental report dated March 9, 1942, includes provisions modifying and altering the rights of creditors generally; provides for fixed charges in such amount that, after due consideration of the probable prospective earnings of the property in the light of its earnings experience and all other relevant facts, it shall be adequately covered by the probable earnings available for the payment thereof; and it includes adequate means for its execution. The plan is fair and equitable, affords due recognition of the rights of each class of creditors and stockholders, does not discriminate unfairly in favor of any class of creditors or stockholders, and conforms to the requirements of the law of the land regarding the participation of the various classes of creditors and stockholders; the approximate amounts to be paid by debtor, or its successor, for fees and expenses incident to the reorganization have been fully disclosed so far as they are ascertainable, are reasonable, are within the maximum

limits heretofore fixed by the Commission, and have been approved by the Court. The plan provides for the payment of all costs of administration and other allowances already made or to be made by the Court.

 We affirm the findings of the Commission that the equity of the preferred and common stockholders has no value and therefore the plan need not be submitted to these parties for their approval or rejection. All of the objections to the plan are overruled, the plan is approved and will be submitted to each class of creditors for their approval or rejection: and it is so ordered.

## APPENDIX A.

### Distribution of New Securities Under Approved Plan.1

| Outstanding issue | Principal amount | Principal plus interest to Jan. 1, 1942 | Undisturbed | 10-year 4-percent serial notes | Consolidated-mortgage 50-year 4's | 5-percent preferred stock | Common stock | Total |
|---|---|---|---|---|---|---|---|---|
| Equipment obligations 4½'s series K | $216,000 | $216,000 | $216,000 (100%) | | | | | $216,000 (100%) |
| First-mortgage 4's certificates | 20,000,000 | 20,000,000 | 20,000,000 (100%) | | | | | 20,000,000 (100%) |
| Gray's Point Terminal 5's | 500,000 | 500,000 | 500,000 (100%) | | | | | 500,000 (100%) |
| Shreveport Bridge, etc., 5's | 450,000 | 450,000 | 450,000 (100%) | | | | | 450,000 (100%) |
| Texarkana Union Station 5's certificates | 315,000 | 315,000 | 315,000 (100%) | | | | | 315,000 (100%) |
| Railroad Credit Corporation (Jan. 31, 1941) | 1,318,076 | 1,331,300 | | $1,331,300 (100%) | | | | 1,331,300 (100%) |
| Second-mortgage 4's certificates | 3,042,500 | 3,711,850 | | | $3,711,850 (100%) | | | 3,711,850 (100%) |
| First terminal and unifying 5's | 8,063,000 | 10,683,475 | | | 3,767,114 (35.3%) | $6,812,429 (63.8%) | | 10,579,543 (99.1%) |
| General and refunding 5's | 9,327,500 | 12,358,938 | | | 1,699,750 (13.8%) | 2,814,853 (22.8%) | $4,039,460 (32.7%) | 8,554,063 (69.3%) |
| Stephenville 5's | 2,318,448 | [2] 3,093,943 | | | | | 1,145,594 (37.0%) | 1,145,594 (37.0%) |
| Central Arkansas and Eastern 5's | 932,232 | [2] 1,267,352 | | | | | 473,201 (37.3%) | 473,201 (37.3%) |
| Chase National Bank | 3,500,000 | [2][3] 4,557,591 | | | 896,845 (19.7%) | 1,485,210 (32.6%) | 2,131,354 (46.8%) | 4,513,409 (99.1%) |
| Mississippi Valley Trust Co. | 1,000,000 | [2][3] 1,302,169 | | | 256,124 (19.7%) | 424,152 (32.6%) | 608,680 (46.7%) | 1,288,956 (99.0%) |
| Southern Pacific Company | 17,882,250 | [2][3] 23,456,025 | | | 4,355,844 (18.6%) | 7,213,447 (30.8%) | 10,351,672 (44.1%) | 21,920,963 (93.5%) |
| Preferred stock | 19,893,600 | 19,893,600 | | | | | | Eliminated |
| Common stock | 17,186,100 | 17,186,100 | | | | | | Eliminated |
| General creditors | | | | | | | | As determined by court |
| Total | 105,944,706 | 120,323,343 | 21,481,000 | 1,331,300 | 14,681,527 | 18,750,091 | 18,749,961 | 74,999,879 |
| Charges | | | 872,970 | 53,252 | 587,501 | 937,505 | | |

1 The percentages shown are percents of total claims.
2 Approximate.
3 Interest payable on pledged Southern Illinois & Missouri Bridge Company bonds deducted.
Note: In addition, or with adjustment, holders of Stephenville bonds outstanding and pledged will receive such cash as may be actually due in respect of salvage recovered from the property; and, if so ordered by the court, holders of first terminal and unifying mortgage bonds outstanding will receive $12.89 in cash for each $1,000 of such bonds, and holders of general and refunding mortgage bonds outstanding and pledged will receive $4.41 in cash for each $1,000 of such bonds.